Patricia L. KISSINGER, Administratrix of the Estate of Lee N. Kissinger, deceased, and Harold M. Stern, Ancillary Administrator, Appellees,

v.

James FRANKHOUSER, Appellant.

No. 8426.

United States Court of Appeals
Fourth Circuit.

Reargued May 28, 1962.

Decided Sept. 12, 1962.

Albert V. Bryan and Boreman, Circuit Judges, dissented.

Robert M. Furniss, Jr., Norfolk, Va. (Taylor, Gustin, Harris & Furniss, Norfolk, Va., on the brief), for appellant.

Stanley E. Sacks, Norfolk, Va. (Sacks, Sacks & Kendall, Norfolk, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

SOBELOFF, Chief Judge.

The instant case and Thomas v. Hogan, 308 F.2d 355 (4th Cir. 1962), decided this day, have a common question: the admissibility of an entry in a hospital record showing the result of a Bogen's test for intoxication. Here the District Court ruled the evidence admissible. Kissinger v. Frankhouser, 194 F.Supp. 276 (E.D.Va.1961) (opinion by Hoffman, Ch. J.).

About 1:15 a. m. on October 16, 1959, an automobile overturned on Princess Anne Road a short distance from the main gate of the Oceana Naval Air Station. When found only a few minutes later, the lights of the car were on, the radio was playing, and gasoline was still pouring from its tank. James Frankhouser, the owner and driver of the car, was lying nearby, unconscious and bleeding profusely from a deep scalp wound, and his passenger, Lee Kissinger, lay dead fifteen or twenty steps away.

At the place where this tragedy occurred, the twenty-five foot wide asphalt road is three or four inches higher than the soft shoulder. Other than the deceased and Frankhouser, who claims amnesia, there were no eyewitnesses to the accident. However, the physical facts indicate that the right wheels of the car

had gone off the road onto the shoulder at a slightly banked, left-hand curve, and that the car began to skid as Frankhouser slammed on the brakes. Apparently, when the driver attempted to return the fast-moving car to the hard surface, the right front wheel gouged into the edge of the elevated road, causing the vehicle to flip over. It skipped some 110 feet before coming to rest with its wheels in the air.

Seeking damages for the death, Kissinger's widow, who is also the administratrix of his estate, and the ancillary administrator representing the surviving children, instituted the present case against Frankhouser. Plaintiffs alleged that the defendant's drunkenness, his driving at an excessive rate of speed, and his gross negligence caused the accident.[1] The affirmative defense of contributory negligence was interposed, as well as a denial of primary negligence. These issues were submitted to the jury. The verdict was in favor of the plaintiffs and damages were assessed in the amount of $18,900.

When Frankhouser was taken to the Navy dispensary, Dr. S. B. Meyerson, who was on duty, observed that the man had "the odor of alcohol on his breath," and the doctor's deposition further states that he "suspected that [Frankhouser] was intoxicated." This doctor ordered a Bogen's test and sent Frankhouser to the United States Naval Hospital at Portsmouth, Virginia, for further treatment. Upon examination of the patient at that hospital, the attending physician, Dr. J. M. Marlowe, noted his observations on the "Clinical Record":

1. Laceration scalp and forehead,
2. Fracture left pubis,
3. Bladder damage,
4. No fracture right fibula, and
5. *Simple drunkenness.*

As ordered, the Bogen's test was performed at the Portsmouth hospital by Hospitalman Kent Gibson, and evaluated by Dr. R. P. Heldt. The test showed that Frankhouser's blood had 2.5 milligrams of alcohol per 100 c.c. and Dr. Heldt recorded his finding on a "Hematology Report." Shortly thereafter Dr. Marlowe noted the test result on Frankhouser's Clinical Record.

Over defendant's objection, the hospital record, which included the Clinical Record and the Hematology Report, was admitted in evidence. Basing his opinion on these records, Ramon Morano, a toxicologist of ten years' experience, associated with the office of the Chief Medical Examiner of the City of Norfolk, testified at the trial that Frankhouser was intoxicated on the night of the accident and incapable of properly operating an automobile.

For the reasons stated in Thomas v. Hogan, supra, we think that the hospital record was properly admitted. The defendant's evidence fell short of showing that the Bogen's test was not properly done. The testimony of the hospitalman who performed the test was that he had considerable experience with the test and that he followed the usual procedure in running it. True, he took only ten to twenty minutes to perform the distillation operation, and toxicologist Morano testified that it took him thirty minutes to perform this step, but it appears that Morano uses 4 c.c. of blood in the distillation process, while the hospital procedure calls for the use of only 2 c.c. There was not the slightest suggestion at the trial that the hospital procedure outlined by the witness did not yield a reliable result. Dr. Heldt, who evaluated the test, was not present to testify and his competency was not challenged. Indeed, the testimony shows that he, like Hospitalman Gibson, had considerable experience with the Bogen's test procedure. The test was performed in the regular course of the hospital's business and recorded according to the

---

1. It is conceded that Kissinger was a guest in the car, and was required to prove gross negligence in order to establish liability. See Code of Virginia § 8–646.1 (1950).

regular routine of the institution, thus meeting the requirements of the shop-book statute. The attack on the entry showing the result of the test must fail.

It is to be noted that the defendant did not assert on this appeal, either in brief or oral argument, that the introduction of Marlowe's "Initial Impression" of "Simple Drunkenness," entered on Frankhouser's Clinical Record, was error. He addressed himself only to the entry showing the result of the Bogen's test. However, assuming that a question as to the attending physician's initial impression is raisable, we are of the opinion that the admission of this record entry was proper. When Frankhouser was brought to the hospital, he had a severe scalp laceration, and it was no doubt thought desirable to conduct a Bogen's test to determine whether the symptoms he exhibited were due to head injury or to intoxication. The outcome of the Bogen's test would help to determine the diagnosis and the type of treatment he should receive. The record entry of Dr. Marlowe's initial impression was admissible to show the reason for ordering the Bogen's test, and it supports Dr. Meyerson's suspicions at the dispensary which induced him to order the test.

██ Three questions of state law are raised by the defendant in his attack on the jury's verdict. He asserts that gross negligence and proximate cause have not been proved and that the deceased was contributorily negligent as a matter of law. Little need be said about gross negligence. The evidence shows that Frankhouser was driving while intoxicated, and the Virginia court has taken judicial notice of the fact, universally recognized, that an operator of an automobile may become incompetent and reckless from drinking. Crowell v. Duncan, 145 Va. 489, 134 S.E. 576, 581, 50 A.L.R. 1425 (1926). The jury could in the circumstances reasonably find Frankhouser's reckless conduct "shocking," and its finding of gross negligence

cannot be disturbed. See, e. g., Dickerson v. Miller, 196 Va. 659, 85 S.E.2d 275 (1955).

██ Likewise, there is adequate support in the evidence for the jury's finding of proximate cause. From the testimony that Frankhouser's intoxication rendered him incapable of properly operating his automobile, reasonable men could conclude that this was the cause of the accident. Of course, it is common knowledge that automobiles sometimes run off the road onto the shoulder through no fault of the driver,[2] but, where it is shown that the driver was intoxicated, an inference may be drawn that this was the cause. The issue was properly referred to the jury for decision.

██ Finally, the defendant contends that the evidence shows Kissinger's contributory negligence as a matter of law in riding with his drunken driver. It is asserted that under the Virginia law, a guest may not recover if he knew or reasonably should have known that his driver had been drinking intoxicating liquor to an extent likely to affect the manner of his driving, and the guest voluntarily continued as a passenger after a reasonable opportunity to leave the automobile. The cases cited by the defendant so hold. See Seaboard Air Line Ry. v. Terrell, 149 Va. 344, 141 S.E. 231 (1928); Yorke v. Maynard, 173 Va. 183, 3 S.E.2d 366 (1939); Bates v. Thompson, 200 Va. 501, 106 S.E.2d 728 (1959). However, this proposition of law requires affirmance of, rather than reversal of, the judgment here. The defendant had the burden of proving contributory negligence, see e. g., Burks v. Webb, 199 Va. 296, 99 S.E.2d 629 (1957), and the evidence fails to establish, with sufficient certainty to remove the questions from the jury's province, that the driver's drunken condition was apparent to the deceased or that he had an opportunity to leave the car. There is a complete void in the evidence as to Kissinger's

2. See Richter v. Seawell, 183 Va. 379, 32 S.E.2d 62 (1944); Boggs v. Plybon, 157 Va. 30, 160 S.E. 77 (1931).

conduct between 8:00 p. m. and the accident. The defendant is not warranted in his insistence that the trial judge should have required the jury to speculate that Kissinger knew of his driver's condition and that he had ample opportunity to leave the car. In this respect, the present case parallels Bates v. Thompson, supra, where the conflicting inferences as to the passenger's awareness were held to be for the jury.

We find no error, and the judgment below will be

Affirmed.

ALBERT V. BRYAN, Circuit Judge (dissenting).

The Federal Shop Book rule in my understanding of it is now expanded by the Court far beyond its intendment. As the effect will be to deprive a party—in criminal as well as civil cases—of the right to confrontation by his accuser and the safeguards of cross-examination in other than routine matters, I feel compelled to state my reasons for not joining in the opinion.

Frankhouser and Kissinger were taken by ambulance to the dispensary at the Station. The doctor on duty there noted as to Frankhouser "the odor of alcohol on his breath", and "suspected that he was intoxicated". He testified further that Frankhouser though not unconscious was "in a semi-stuporous condition", and had sustained a blow on the top of his head. This doctor ordered the blood test, and for this purpose as well as for general attention, sent him to the United States Naval Hospital at Portsmouth, Virginia.

The crucial evidence in this case on the intoxication of Frankhouser was the Naval Hospital record. On the "Clinical Record Physical Examination" under date of October 16, 1959 (the day he was admitted) is the entry "alcohol odor to breath". Upon the same sheet under "Initial Impression" is written "simple drunkenness". This record is signed by a Dr. J. M. Marlowe. In the same record of that day in "Doctor's Progress Notes" is entered "Borgans 2.5 mgm at 0315.

J. M. Marlowe". The "alcohol odor to breath" entry the District Court ruled to be inadequate in itself to prove intoxication.

Dr. Marlowe was not called as a witness. In fact he did not ask for, make or receive the Bogen test. Although it appeared in another part of the hospital record and may have been seen by the jury, neither Court nor counsel noticed until *after* the trial that a Dr. Heldt had requested, received and evaluated the test. He did not testify. Only the hospitalman at the Naval Hospital who had extracted the blood and run the test testified to it. A toxicologist took the stand for the plaintiff and explained to the jury the mechanics and meaning of the Bogen method. He stated, "Well, obviously 2.5 is a marked degree of intoxication and there is no question that the person could not properly operate a motor vehicle".

Admission of the hospital record as well as the testimony of the hospitalman and the toxicologist was opposed by defendant Frankhouser. The ground of the objection was that the entries could not be received under the Federal Shop Book law, 28 U.S.C. § 1732—the only basis urged for their admission—because they embodied an opinion, rather than reflecting a regular event in hospital routine.

Error, I think, was committed in the reception of the hospital record. The issue on which it was adduced could not be proved by the entries alone. The first—"simple drunkenness"—was, as the record declares, only a conditional finding. Both this and "Bogans 2.5 mgm" were expressions of opinion derived through professional judgment. The recordation was not simply of the habitual or commonplace incidents of a patient's hospital stay as the statute contemplates. Without the aid and exposition of the author—he was not a witness in the trial —these notations in my judgment were not provable.

I. As previously suggested, the notation of "simple drunkenness" was merely "Initial Impression". Obviously the physician did not accord it definitiveness:

on its face it was but tentative. He intentionally indicated a reluctance to express himself categorically. An impression is merely an immediate, and often only passing, idea. "Initial" in the circumstances is a primary, "first-blush" or first-glance thought—one at the outset. The vagueness of "simple" points up the wholly provisional nature of the conception. The examiner here registered an unsureness, and was frank about his uncertainty. It was a diagnosis which the diagnostician would not and could not vouch as a final opinion.

The doctor's wisdom is evident. Here was a patient suffering from severe trauma to the head. The examining physician at the Station dispensary had merely "suspected" intoxication. Marlowe too detected the odor of alcohol, but the patient's actual condition certainly could not be fairly appraised in the circumstances. "Symptoms which are characteristic of drunkenness may result also from many different causes (e. g. epilepsy, brain injury, diabetic or kidney disease) * * *." 7 Encyclopaedia Britannica 792 (1961 ed.) Apparently, the doctor was only noting a possibility, based on his immediate observations, to guide and expedite later diagnosis and treatment. He never confirmed it.

This evidence, I think, should not have gone to the jury, primarily because it was only an impression. A jury is not permitted to hear a diagnosis which the doctor will advance only tentatively; unless final, its probative value is nil. In re Buck's Dependents Case, 342 Mass. 766, 175 N.E.2d 369 (1961); Lyons v. Chicago City Ry., 258 Ill. 75, 101 N.E. 211 (1913). Moreover, for the same reasons I note in a moment for believing the Bogen test entry inadmissible, I would also reject the "simple drunkenness" memorandum.

II.   The Bogen's method of determination of the alcohol content of human blood

is not a simple reading, such as a temperature taking, which a literate layman can make. Two stages are involved: the running of the test and then its evaluation. The testimony provides a somewhat complete description of the process. The necessary apparatus consists of two vertical test tubes, side by side, "with inlet tubes to the bottom of each and outlet tubes to each side". In the first tube are placed 4 ccs. of the blood specimen together with what is known as a Scott-Wilson reagent (to eliminate "acetone bodies in case of diabetics"). A defoaming element is also included. In the next or second tube—the receiving tube—are put 9 ccs. of Anstie's reagent, consisting of potassium dichromate and sulfuric acid. The tubes are then immersed in boiling water.

To the second tube is attached an aspirator, which is activated to reduce the pressure in the system. The alcohol in the blood in the first tube is volatilized by the heat of the water bath, and passes over into the second tube containing the Anstie's reagent. The "boiling and aspirating" in the distilling process must continue for a half hour. As the alcohol distills over, it condenses into a green chemical-chromic sulphate. By comparison of its hue with results of tests of known alcoholic content through the use of a colorimeter, the amount of alcohol in the specimen is assessed by the evaluator.* Thus, the first stage calls for an expert execution of a prescribed technique and the second a professional appraisal of the results of the first. Instantly, the toxicologist called to evaluate the test report, as I read his testimony, completely destroyed the acceptability of that test. The use of 2 ccs. of blood by the technician for the test, as noted in the majority opinion, instead of 4 does not excuse the care, knowledge and attention the run requires for reliability.

The aim and history of the Shop Book rule deny it, to my mind, the scope the

---

* For a lucid, graphic and scholarly exposition of the entire process, see: Determination of Ethyl Alcohol in Blood, by Sidney Kaye, M.SC. and Harvey B. Haag, M.D., Journal of Forensic Medicine (October-December 1954) 373; and Emergency Toxicology (2d ed. 1961) by Sidney Kaye, M.SC. Ph.D., of Richmond, Va.

majority gives it. Never was the statute intended of its own force alone to authenticate opinion. Never was it designed to enable mere opinion to stand by itself for what it speaks in judgment. Never could it qualify an entry to testify —untried by cross-examination—to a diagnosis or prognosis. Not even the expert himself who was responsible for the entry would have such testimonial stature and immunity. An expert ascertainment is not "any act, transaction, occurrence, or event" as the statute contemplates. These refer to bare happenings, e. g., the presence of the patient in the room, whether abed or ambulatory, if on or off a diet, in a cast or not, treatments received, medicines prescribed and administered, and similar matters of course, routinely and regularly recorded. The majority opinion combats the expressions of the Supreme Court in Palmer v. Hoffman, 318 U.S. 109, 113–115, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

Intoxication is commonly known to be quite a debatable state. Juries have wrestled with it on instructions formulated only after difficulty by both court and counsel. To say that a hospital entry may be taken as a declaration of the patient's condition in this respect is to accord it an evidentiary position wholly unjustified, indeed, offensive to our system of search for truth. Moreover, the Bogen test is of so grave consequence and has such vast import both in civil litigation and criminal prosecutions that I think it should be treated only for what it actually is—an expert ascertainment and not a mere mechanical exercise. This is peculiarly true when the result is to be given effect extramurally, not simply retained for the general reference of the hospital's physicians who know how much credence it should receive in the circumstances of its procurement and their use of it.

The gravity of the danger of admitting such hospital entries without the doctor's verifying testimony is starkly drawn by reference to its use in criminal cases. One could be convicted of a felony upon these entries alone, if guilt or innocence depended on sobriety or inebriety. Alarming and unthinkable there, it is little less so in a civil action of importance.

Slight consolation is provided the affected party by the statute's invitation to him to assail the record. The assault would be directed at the responsible doctor. But rarely would he be at the trial—the Shop Book authentication takes his place. In this the proponent is highly advantaged to the prejudice of his adversary, for he would neither have to produce the doctor, nor qualify him. Indeed, no qualification at all of any expert —medical or technical—would be required. The opponent would be deprived even of the right to inquire into the doctor's knowledge of what he had recorded, or the medical basis for his opinion. All this again but demonstrates the unfairness of the Shop Book entry as proof of an opinion. This inequity becomes the more manifest in the instant situation where the opinion is of an evanescent condition—it cannot be confirmed in any way. This alone would seem to destroy its "probability of trustworthiness"; the statute was not intended to "opens wide the door to avoidance of cross-examination." Palmer v. Hoffman, supra, 318 U.S. at 114, 63 S.Ct. at 481.

New York Life Insurance Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297, 301 (1945) firmly establishes the inadmissibility of an opinionative entry in a hospital record. Admittedly, the Court mentions in obiter the eligibility under the statute of a notation in the record of a physician's observation of drunkenness. It is inapposite here because the instant entries are far more than observations: first a tentative finding and then a chemical analysis.

But admittedly there are decisions actually or apparently contra. See, for example, Reed v. Order of United Commercial Travelers, 123 F.2d 252 (2 Cir. 1941). In most instances, however, upon scrutiny it will be seen that the hospital records received in evidence related only to factual matters, or the doctor was in court to corroborate them. This is why

the District of Columbia decision in Wheeler v. United States, 93 U.S.App.D. C. 159, 211 F.2d 19, 22 (D.C.Cir.), cert. denied 347 U.S. 1019, 74 S.Ct. 876, 98 L. Ed. 1140 (1954) cannot be said to overrule the view expressed in New York Life Insurance Co. v. Taylor, supra. In the later case the Shop Book statute was used merely to identify certain slides of smears as a genuine record of the latter. Other cases are inapplicable since they involved statements in his history made by the patient himself, doctors' recitals of what was *seen* on autopsy, birth dates and parentage, or observations of foreign substances found in the body.

Cited as contrary authority is our decision in United States v. Wescoat, 49 F. 2d 193 (4 Cir. 1931). But the circumstances there were quite different. To begin with, the only objection raised was the cry of hearsay, and the right to admit an opinion under the Shop Book rule was nowhere involved. The evidence consisted of a soldier's field medical record fastened to his clothing. A diagnosis of "choroiditis"—an eye inflammation—was included. Foremost, however, in difference is that the record was signed successively by medical officers of the United States, the defendant, and was thus binding on the defendant.

True, this court has said that "The alcoholic content of the blood * * * is an objective fact, not a mere expression of opinion * * *". Kay v. United States, 255 F.2d 476, 481 (4 Cir. 1958). But there the reference was directed to a certificate of content which was by fiat of statute, now 1950 Code of Va. 18.1–55 et seq., made an evidential fact. This fact in turn gives rise to certain presumptions. The expert whose determination is acceptable is named by statute. His qualification is conclusively established thereby. But, paramount, the blood test can be made only at the request of the accused and with his implied consent that it may be used in evidence against him in a *criminal* prosecution.

I do not mean to say that hospital record entries of a preliminary diagnosis or result of a Bogen test are not pertinent to an inquiry upon intoxication. I do mean to say the entries do not by themselves prove their truth.

I would set aside the verdict and the judgment thereon and order a new trial for error in the admission of the hospital record entries.

Judge Boreman has authorized me to state that he joins in this dissent.